## Case No. 9,117.

MARSH et al. v. The MINNIE. COMMINS
v. SAME. BEE et al. v. SAME. SMY-
ZER v. SAME.

[6 Am. Law Reg. 328.]

District Court, E. D. South Carolina. 1858.

MARITIME LIENS—SUPPLIES—HOME PORT—CON-
FLICT OF LIENS—MORTGAGE—REPAIRS.

1. By the maritime law there is no lien for
supplies in the home port. The credit is sup-
posed to be given to the owner, and not the ship.

2. J. C. owned the brig M. and sold to T., who
secured the purchase money by a mortgage duly
executed and recorded. Subsequent to the sale
and execution of the mortgage, J. M. & Son re-
paired the brig and kept her in their custody
until the marshal attached her; B. & T. fur-
nished ship chandlery, but were at no time in
possession; H. S. did the joiner work, but was
at no time in possession: *Held*, that these liens
must be marshaled, as follows: First, J. M. &
Son, the shipwrights, must be paid, because they
had a strict maritime lien, and had possession,
and no act of the owner can defeat a lien which
the law creates; second, the mortgagee; and
third, the balance ratably to the other libelants.

[Cited in The St. Joseph, Case No. 12,229.
Cited in note in The Skylark, Id. 12,928.
Cited in brief in The Illinois, Id. 7,005.]

3. The mortgage act of 1850 [9 Stat. 440] con-
sidered and interpreted.

[Cited in Srodes v. The Collier, Case No. 13,-
272.]

4. Where the vessel is in her home port, and
the material men are not in possession, and no
local law recognizes their claims as privileged,
they must be postponed to the mortgage creditor
who has an interest in rem.

In admiralty.

Wm. D. Porter, for James Marsh & Son.

Edwd. M'Cready, for Bee & Tylee and
Henry Smyzer.

M. P. O'Conner, for John Commins.

MAGRATH, District Judge. In these cases
libels have been filed to recover certain sums
of money, and for which, it is contended in
each case, that there is a lien. John Com-
mins, being the owner of the brig Minnie,
sold her to W. H. Trott, the purchase being
altogether on credit. W. H. Trott gave his
promissory note to John Commins, dated the
19th May, 1856, at sixty days, for $1,400, and
to secure its payment, executed a mortgage
of the brig, dated the 4th June, 1856. The
mortgage is duly executed, and recorded in
the office of the collector of customs for the
port of Charleston, where the brig is regis-
tered. The note is still unpaid. On the 7th
June, 1856, James Marsh & Son, who have
also libeled, and are shipwrights, commenced
repairing the brig. They continued to work
upon her until the 7th August, 1856, at which
time, having completed their work, they now
claim that there is due for it $2,808 30. Be-
fore they commenced, they took the brig into
their possession, and so kept her until they
surrendered her to the process of this court.
They also claim the further sum of $131 for
the services of a ship-keeper. Bee & Tylee,

ship chandlers, have also libeled the brig for
$1,994 38, the value of materials and supplies
furnished by them. They have not been in
possession. Henry Smyzer, ship joiner, has
also libeled for $372, the value of work done
by him. He has not been in possession.

The lien claimed by James Marsh & Son,
is derived from the possession, which, as ship-
wrights, they had. The lien claimed by John
Commins is derived from his mortgage. The
lien claimed by Bee & Tylee and Henry
Smyzer, is derived from the allegation that
the brig was owned out of the limits of this
state. Had such proof been made as satisfied
me that this allegation was supported, it
would have led me to decree the payment of
these claims, in an order different from that
which I will now direct. In such a case, liens
under the rule of the maritime law, would have
been implied (in the absence of the owner)
for the benefit of all material men. But this
has not been proved. W. H. Trott may be a
citizen of New York and not resident within
the limits of this state; but if so, it admits
of higher and stronger proof than has been
made, and which consists of idle discourse in
which he indulged. If his declarations con-
cerning his residence in New York are enti-
tled to weight, as proof of that fact, then
would his declarations as to his residence in
Charleston, be also entitled to weight. In
the mortgage to Commins he declares himself
a citizen of Charleston, and he must have
sworn to the same statement. I cannot, then,
under such circumstances, declare him to be
a citizen of New York, or resident of any
other place than Charleston, particularly
when the consequences to him might be so
very serious. Had the non-residence here of
W. H. Trott been proved, it would not have
availed the parties who, from it, if proved,
supposed that a lien would arise in their
favor. For he is here, and has been here,
and might have been sued. And when the
owner is present, the reason for the mari-
time lien ceases, and the contract is inferred
to be with him, on his ordinary personal re-
sponsibility, without a view to the vessel it-
self as security. St. Jago de Cuba, 9 Wheat.
[22 U. S.] 409, Fland. Mar. Law, 186. The
brig is then before me, as in her home port,
where her owner resides, and upon this I will
now proceed to determine the relative posi-
tions of the lien claimed against her.

A lien arising under the maritime law is
neither derived from, nor governed by the
same principle as relates to a lien at common
law. By the common law "a lien is the right in
the possessor of property to hold it for the
satisfaction of some demand." Mont. Liens.
The right to retain the possession, and the
fact that it is retained, are essential to a lien
in every case. Lickbarrow v. Mason, 6 East,
27. But, in the maritime law, possession is
not material in a question of lien. By that
law, the benefit of the lien may be preserved,
consistently with the enjoyment by the debtor
of the right of ownership, including in this,

the possession and control of the vessel. In countries which admit the rule of the civil law, which is also the rule in the admiralty, repairs and necessaries form a lien upon the ship. Such was the law in England, until reversed by the house of lords in the time of Charles II. The Zodiac, 1 Hagg. Adm. 325.

It is, perhaps, too late for us to inquire with what reason the rule of the maritime law, which followed that of the civil law, in regard to liens, was modified in England. A sense of natural justice is satisfied in declaring, that he who expends labor for the benefit of another shall be entitled to look to the thing benefited by such labor, as the primary source of such payment. No equivalent is afforded for the denial of this, in remitting the creditor as in the case of a material man to his personal action against the owner. A remedy operating wholly in personam is very seldom an efficient substitute for a proceeding in rem. But if it is no longer of use to examine the reasons for which, in former days, essential modifications and, in some cases, positive prohibitions were adopted in relation to the admiralty, there is still great use in understanding how a spirit of rivalry, permitted to interfere, falsified the great issue of determining a question between courts of auxiliary and, in some cases, of concurrent jurisdiction, by reference to the public good, and made every thing subordinate to a desire for success. Without the jealousy, and with little, if any, of the acrimony which marked the discussion in England; but nevertheless with great interest and ability, has the question been discussed in the United States, of the meaning in the constitution of the United States, of "all cases of admiralty and maritime jurisdiction." De Lovio v. Boit [Case No. 3,776]; Ramsay .v. The Allegro, 12 Wheat. [25 U. S.] 611; Bains v. The James and Catharine [Case No. 756]; The Huntress [Id. 6,914]. And without introducing here anything not pertinent to the case before me, I may very well observe, that the admiralty and maritime jurisdiction of the United States is not determined by the narrow construction which in England served to define it; but embraces a larger number of cases, recognized as properly within its spirit and jurisdiction.

When in the time of Charles II., it was resolved, that the jurisdiction of the admiralty did not extend to cases in rem where the common law courts would afford a remedy in personam, the lien, which until then belonged to the material man, was lost. In all cases, therefore, where the ship was in her home port, or the person of the owner could be served, the lien of the material man was divested, and the remedy was by action against the owner. With foreign ships the lien was preserved, but from necessity; and it is only with such vessels that the material man enjoyed that security which once applied to all vessels. But in England, and in many of the United States, the wisdom of the maritime law as formerly enforced, has been vindicated by recent legislation. New York, Pennsylvania, Louisiana, Illinois, Indiana, Massachusetts, Maine, Connecticut, and perhaps others, have provided, that on all vessels, whether foreign or domestic, in the home port or abroad, material men shall have the benefit of a lien to the extent of work done or supplies furnished. In South Carolina there has not been any corresponding legislation; and the general rule applicable is that laid down in The General Smith, 4 Wheat. [17 U. S.] 438. To this rule in England, and in the United States, there has been always an exception in favor of the shipwright who may be in possession. Abb. Shipp. 178; 3 Kent, Comm. 169; The Vibilia, 1 W. Rob. Adm. 7. For him a lien arises from the common law. Fland. Mar. Law, 186, 4 Barn. & Ald. 341. And the contract for repairs being a maritime contract, the lien may be enforced in the admiralty. Peyroux v. Howard, 7 Pet. [32 U. S.] 340. The lien claimed by James Marsh & Son, is of this kind, and corresponds to the lien which they would have under the general maritime law. But its value when enforced in this court, depends on the solution of another question; and that is, whether it will be here considered, as it would be in a court of law; or whether it will be here treated as a maritime lien in the proper sense of that term. And this question involves an important issue, as between James Marsh & Son and John Commins. If they have but the naked lien of the common law, they must be postponed to John Commins; but if, as material men in possession, they have a lien which can be enforced in the admiralty; and it is enforced here, as a maritime lien, then they will be preferred.

At the common law, a lien implies a power to hold, nothing more. He who has a lien, may hold; but except in certain cases, which need not be here considered, he cannot sell. The sale of the property to satisfy the lien can only be accomplished through an execution, following the judgment in a personal action against the owner. He who holds a lien, detains the thing which it affects, until he gets his judgment; and then sues out his execution under which he sells. In the admiralty, as has been already said, possession is not essential to the lien. The Marion [Case No. 9,087]. The lien is in rem; not only against the thing, but in the thing. Adhering to it, from its equitable properties; following it, into the hands of third persons; and never divested, but by payment; destruction of the thing; or consent of parties. Although wide in its operation, and liberal in its spirit, it can never do injustice. It is closely watched; and is ever defeated by that evidence which would be sufficient to establish the conclusion of personal credit to the owner. It cannot be used for fraud; because it cannot be kept secret, by being delayed; for it would be unsafe in him who

claims it, to allow it to remain not enforced longer than the end of the voyage then in progress. The Carter, 4 Cranch [8 U. S.] 332; The Boston [Case No. 1,669].

In the admiralty, when a lien arising from some other source than the maritime law is enforced, it will be, according to the rule of the maritime law, and to the same extent, with a general maritime lien of that class, unless its operation is otherwise limited. If there is no limitation or qualification of the lien, by the law creating it, then this court will not undertake to affix to it, limitation or qualification. As it comes without either, so will it be enforced. The Marion [supra]. A material man, who acquires a lien, either by the common law or statute, under a maritime contract, and enforces it in this court, must enforce it in the same manner as a pure maritime lien, unless made subject to some qualification under the law which creates it. Davis v. A New Brig [Id. 3.643]; Fland. Mar. Law, 187. These general principles must now be applied in deciding to what rank shall this lien of James Marsh & Son be assigned in the distribution of the proceeds of this vessel. Is it preferred—held to be equal—or postponed to the mortgage held by John Commins, and which is prior in date to this lien? I have established it, when adopted in this court, as a maritime lien. It is enforced here, because it is connected with a maritime contract, and is in consistency with the principles of the general maritime law, which give a lien in all such cases. And the admiralty court, when it enforces this lien, must do so upon the same principles that it applies to the lien under the general maritime law, and to the same end; which is to have a preference for a debt which it holds as privileged. Boone v. The Hornet [Case No. 1,640]. The sale is the mode in which this court gives value to the lien, and secures the preference. By it the lien, whether operating as a power to hold, or in any other manner, becomes converted into money, out of which creditors may be paid. The contract out of which it arises is, as I have said, a maritime contract; and to such a contract the maritime law gives a lien. That lien is not allowed here, in the home port of the vessel, to exist; but another lien, by another code of laws, may arise: and such a lien this court is competent to enforce, but only because, growing out of a maritime contract, it is here still regarded as a maritime lien. There is no rule concerning its enforcement, in the local law out of which it arises. This court, then, has to consider it as it would its own lien, in a similar case, if it were operative. And the priority which it would give to that lien, it will give to this.

The mortgage held by John Commins is not a maritime hypothecation, and cannot, as an original proceeding, be maintained in this court. Bogart v. John Jay, 17 How. [58 U. S.] 399. In the maritime law it is not compared with those contracts which furnish the means by which a vessel is aided on her voyage. Ships, in the quaint language of the law, were made to plough the seas, and not to rot in the docks. And the contracts which are instrumental in aiding them to accomplish their mission, are preferred, to such as detain them. A mortgage, when compared with a bottomry, is called a dry security; it imparts no vigor to the thing to which it is attached.

Much has been said of the notice which James Marsh & Son had of the mortgage, when they were doing this work. I do not think that a question of notice has any place in a discussion involving the operation and effect of maritime liens. They do not arise by agreement—are not created by the act of parties—but are in themselves legal consequences. No one can, by his act, prevent a creditor, having a lien on his property, from enforcing it. But he is equally disqualified from defeating a lien which the law creates. If James Marsh & Son were not in possession, no person could give them a preference over the mortgagee. If the general maritime rule prevailed here, (and I have decided that it is considered as prevailing here, pro hac vice, through this lien of these material men,) no act of an owner, whether prior or posterior in time, could give any one a preference over the material man. Their contract is with the vessel itself, not with the owner; and to it a fixed place is allotted in the maritime law, which no one can disturb. Nor is there in this rule any hardship which may, at the first view, appear as any objection. Let it not be said that by it the owner can at any time extinguish the mortgage by a contract for repairs, which create a lien prior to the mortgagee. If an owner should attempt to make a contract for which a lien arises, and which in its operation supersedes the claim of the mortgagee, that mortgagee, if he were entitled to it, would have a right in equity to enjoin the progress of the work, until such measures might be adopted as would stay the progress of the work. However it may be in cases which the law cannot reach, yet, in all cases which it can reach, it enforces the principle that no one shall indirectly do, that which he cannot do directly. A mortgagee cannot waste or destroy that which he has made the subject of security to another.

Before leaving this part of the case, I must add, that I cannot consider the equity of the mortgagor comparable with that of the shipwright. This is not the vessel which the mortgagee took as security for a debt. Much work has been done, much labor expended, much material supplied. If in this case the shipwright did not have a lien, by virtue of his possession, all would be lost to him. The mortgagee would have power to sell, and unless the material man is able to protect himself, by buying or bidding, the debt of a mortgagee, secured by a hull, may

be paid by the bill of sale of a vessel, repaired and refitted at a heavy expense.

I proceed now to inquire how far the priority claimed by James Marsh & Son is affected by the act of congress passed in the year 1850, and which provides that no bill of sale, mortgage, hypothecation, or conveyance, shall be valid against any other person than the grantor or mortgagor, his heirs and devisees, and persons having actual notice thereof; unless such bill of sale, mortgage, hypothecation, or conveyance, be recorded in the office of the collector of customs where such vessel is registered and enrolled. And to this is added the proviso, "that the lien by bottomry, on any vessel created during her voyage, by a loan of money or materials necessary to repair, or enable such vessel to prosecute a voyage, shall not lose its priority, or be in any way affected by the provisions of this act." If the act of 1850 had been passed to marshal the liens which arise under the maritime law, or to classify maritime contracts, then it might be that the omission of a certain claim, in the enumeration of such as shall constitute a prior class, would be equivalent to its postponement. But that which congress intended to regulate was of a very different kind. The rights and liabilities of a mortgagee of a vessel had been a matter of doubt and controversy, often submitted to courts, and not unfrequently resulting in contrary decisions. To prevent this, and settle all doubt, by not allowing any interest to affect third persons, of which they did not have actual notice, congress declared that no transfers of a vessel, absolute or qualified, should be valid, except as against the grantor or mortgagor, his heirs and devisees, unless recorded. The only possible ground for the opinion that this question is affected by the act of 1850, is from the use of the general term, "hypothecation." But it is quite clear that "hypothecation," as used in the act, must refer to that class of hypothecations which are proved by some instrument in writing, and are created by the act of the parties. In the maritime law, all maritime contracts imply hypothecation; but the cases in which these hypothecations arise are clearly such as never could be in the contemplation of those who framed that act, as proper to be recorded, or that it should be essential to their validity. It is well that he who has a lien created by the act of parties, should not hold it so that it may be injurious to others. If the law does not require the transfer of a vessel to be recorded, it is as good without the record as with it. No wider field could be opened for fraud, than the privilege of having liens, and keeping them secret and concealed. This mischief is met by the act of 1850. And its operation would seem to include every case, where a transfer, absolute or qualified, is made in writing, and therefore capable of being recorded.

The general rule being thus laid down, a bottomry bond must be specially excepted; for that is an hypothecation created by the act of parties, and exists in writing. It would thus, unless excepted, be governed by the act, for there is no test of priority under the act, except that arising from recording. Whatever transfer is first recorded, passed the interest, absolute or qualified, which it professes to convey. But nothing could be more unjust than the operation of that rule in relation to a bottomry bond. Such hypothecations arise abroad: the act of the master in a foreign port, where he can have, or is supposed to have, no other resource, with which to prosecute his voyage or repair his vessel. To be foreign has been considered so essential a characteristic, that it has been doubted whether the owner in her home port can make a valid hypothecation in a security of this kind. The St. Jago de Cuba, 9 Wheat. [22 U. S.] 416. If a stranger, far away, makes with the master a bottomry contract, by which the vessel is floated and speeded on her course, shall such a contract be postponed to some other, made by the owner, and for which priority is claimed, because it is recorded? Such would be the consequence, if bottomry bonds were not excepted. To obviate this difficulty, the exception is made in the manner already stated. But a bottomry bond is simply excepted, it is not preferred by the act; it is left where it would be, if the act had not been passed. If the bottomry holder had a priority before the act, he will still have it. But he did have a priority given by the maritime law: to it, then, we must refer for the nature and extent of that priority. Whatever is the relation which a bottomry contract bears to other maritime contracts, according to the maritime law, determines the relation which such maritime contracts would bear to those mentioned in the act of 1850. If such maritime contracts are preferred by the maritime law to a bottomry contract, and a bottomry contract is entitled to a priority over the contracts mentioned in the act of 1850, of course the preference of such maritime contracts as those mentioned in the act of 1850 is at once necessary and clear.

There is no mode of considering maritime hypothecations in which the impossibility of regarding them as necessarily to be recorded, does not become apparent. I have said that they often arise from circumstances, often suddenly developed; and their nature and extent, in most cases, is not known until they are perfected, and capable of being enforced. The extent of repairs is generally uncertain, and the amount of the debt continues uncertain until the work is done. The wages of a seaman can never be calculated until the voyage is ended. The claim of a freighter for damage does not arise until, the damage being done, the vessel arrives in port. If a ship from New York, being damaged, is in this port refitted and repaired, can a mortgagee from that city take her out

of the hands of the shipwright? Can he extinguish a claim for damage under affreightment, by exhibiting his mortgage? Can he deprive a seaman of wages, because the contract for his services has not been recorded? No one will affirm either of these as results which the law would accomplish; yet they are, if the act is not read with the qualifications I have suggested.

But the public mischief which would arise from any other construction of the act, than that which I have suggested, would be deplorable. The rule under which maritime hypothecations are protected, is peculiar to no clime, bounded by no territory, confined to no locality. They operate as security for the material man, and as security for the owner of the ship. To the one, it gives the vessel as security for the work he may do; to the other, it offers the assurance that, if disaster shall befall his vessel, she will be refitted and despatched on her voyage. It is a common covenant, to which the commercial nations of the world are parties, and in which each secures for its citizens or subjects, indemnity and succor. Its cardinal principle, therefore, is that a maritime contract implies hypothecation: work done and supplies furnished create a special security in the vessel. No evidence is required of the assent of the owner: the maritime law implies it from the necessity, and supplies it. It gives it for him, and makes the security prior to others. In the strong language of Judge Johnson, "the vessel must get on: this is the consideration that controls every other." "The whole object of giving admiralty process and priority of payment to privileged creditors, is to furnish wings and legs to the forfeited hull to get back, for the benefit of all concerned." The St. Jago de Cuba, 9 Wheat. [22 U. S.] 416. If this contract is broken or disturbed, so that the security implied in a maritime contract is denied or made doubtful, and the lien of the foreign mechanic or merchant is made subordinate to contracts in the home port, a blow will be struck at commerce productive of the most ruinous consequences. The lien of James Marsh & Son I held, therefore, prior to that claimed by the mortgagee.

I come now to the consideration of the claim of the mortgagee. Freed from the questions which have been considered, he would have a right to a sale of the vessel in default of payment, and the surplus would belong to the mortgagor. But his right to any priority is contested; and it is a matter of importance to him, as it is supposed that the vessel will not be sold for as much as is necessary to discharge all the claims made against her. After seamen's wages, which are favored in admiralty and held sacred as long as a plank of the ship remains, the claims of material men receive the consideration of the court. But in this case, as this is the home port of the vessel, these material men have no lien. They are not in posses-

sion, the vessel is in her home port, and no local law recognizes their claim as privileged. They are in this court because they are parties to a maritime contract, which entitles them to pursue their remedy in personam, although they have no lien; and they may intervene in the distribution of the surplus after liens are satisfied. On the other hand, the mortgagee has no maritime contract for which he can seek a remedy here; yet he has an interest in the thing itself. The question is between two kinds of creditors, the one never having had a lien, and the other having had, at one time, a lien, which has been diverted in consequence of the extinguishment of the thing in specie, by the action of the court in its order for a sale. The right which the mortgagee had he cannot enforce, because the court has assumed jurisdiction of the subject matter; and being competent to do so, no other court would interfere. Had the mortgagee seized the vessel, it would not have ousted the court of its jurisdiction. And a sale if made by him, would not affect a subsisting maritime lien, not waived or lost from want of diligence. Filing a bill for foreclosure would have involved the question how far it was a proceeding in rem, to determine whether the material man were by it deprived of the rights which are recognized in this court. Wall v. The Royal Saxon [Case No. 17,093]. It must not, however, be understood from this, that the mortgagee is affected in his proper rights in the security which he holds. It is not because in the admiralty a lien paramount to his mortgage is enforced, which lien could not be adjudicated in a court of law or equity, that his rights are thereby diminished. His rights are determined not only according to principles administered in a court of law or equity; but are also held by him subordinate, to such also as are enforced in a court of admiralty and maritime jurisdiction. The proper measure of any right is determined by the combined operation and effect of all laws which are of force in relation to it. It would, therefore, be extremely incorrect to say, that had the mortgagee sued in this, or that court, or pursued this or that course of conduct, that his rights would be properly any other, than such as they will be under the decree of this court, or of any other court of competent jurisdiction. It would argue but little for the excellence of our system of jurisprudence, if it depended on the court to which a party appealed, to determine whether he would obtain the whole or the half of that which he claimed. Such a rule would measure the rights of parties by the pleasure of the suitor, for having choice of the forum, he would seek that most favorable to him. If the mortgagee here had prosecuted his claim in another forum, to which it would appear, that under another code of laws, not administered by it, there were other rights in the same subject matter; it would be the duty, as it has been always

the custom of judicial tribunals in such cases, to allow the question to be decided in that tribunal where all the rights of all the parties could be considered and adjudged.

I have made these remarks, because in the course of the argument, much was said of what was done, and of what might have been done. But no court will enforce a right to the prejudice of some other right, which can only be enforced in another court. If in a court of law, its proceedings are likely to be perverted by suitors to purposes of wrong, a court of equity is open to afford relief. When the judgment of a court has been pronounced, with all parties before it, and the court has competent jurisdiction, it is presumed to be right. But if parties have been excluded, or could not be heard; or a question has been passed over; or could not be decided; and in consequence of this, injustice has been done; then I should be slow to doubt, what so far from doubting I affirm, that there is always a mode open and available by which error may be corrected, omissions supplied, and right and justice administered in the most complete manner. It is not then, because the mortgagee has been stopped, that this indicates more than the authority of a court has been substituted for that of an individual. His rights are still to be determined. He has now no claim in rem; but the proceeds of the sale represent the vessel. His claim is postponed to the shipwrights', because they had a lien which I have sustained as a maritime lien, and prior. But the other material men have no lien; and therefore no remedy in rem. Of course, they cannot have an equity against the proceeds of sale, except as against the owner. Their admission here to be paid from the surplus, is a doctrine at first slowly received; and concerning the true source of which there is not even now the certainty that we might expect and desire. Their claim upon the surplus is worked out through the debtor; and their equity as against him, in the proceeds of a sale, is admitted. But that cannot be compared with the claim of a mortgagee, which existed as a lien affecting the vessel itself, was divested by the action of the court, and postponed to another lien; but which by the plainest principles of equity survives against the proceeds, or the surplus which remains, to the exclusion of all others who are but general creditors.

I have no hesitation in holding, that after the payment to James Marsh & Son, John Commins is entitled to be paid the amount due him under his mortgage. The balance then remaining will be divided ratably between Bee &·Tylee and Henry Smyzer. The decree will be so entered.